UNITED STATES, Appellee

v.

HENRY L. HUNTER, Private, U. S. Army, Appellant

2 USCMA 37, 6 CMR 37

No. 359

Decided October 17, 1952

LT. COL. George M. Thorpe, USA, for Appellant.

LT. COL. Thayer Chapman, USA, MAJ. Augustus A. Marchetti, USA, and 1ST LT. Eugene L. Grimm, USA, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case is before the Court pursuant to Article 67(b)(1), Uniform Code of Military Justice (mandatory appeal), 50 USC § 654, requiring that we review all cases in which the sentence, as affirmed by a board of review, imposes the death penalty.

On April 12, 1951, at about 12 o'clock midnight, a hatless negro soldier, dressed in fatigue clothes, tried to force entrance into a house in Towhari, Korea, occupied by An Sun Yea, her husband, her one-year-old baby, and another Korean woman, Lee Yong Sun. After failing in his attempt to gain entrance to the house, the soldier pulled some straw from the roof, placed it by

the house, and set it afire. Lee Yong Sun went outside where she attempted to extinguish the blaze. The soldier fired his carbine at her, and the bullet pierced her left thigh. Thereupon, the soldier started to enter the house where he encountered An Sun Yea, with her baby on her back. The soldier grabbed her and attempted to force her back into one of the rooms of the house. She resisted and was shot in the chest, the bullet passing through her body and continuing on through the thigh of the child. An Sun Yea called out for assistance, escaped from her assailant and succeeded in reaching the home of Kim Kyu Yul.

Shortly thereafter several slugs from a carbine were fired into the house of Kim Kyu Yul, which was located across the court from the house where the first shootings occurred. Two occupants of the house, Shin Jai Won and Chung Hak Soo, were both mortally wounded and died within a few hours.

Immediately following the latter shootings, a hatless negro soldier entered the house of Park Yong Hoon, about 100 to 150 meters away. After demanding a girl and being informed that none were there, he took Kim Chung Cha, a ten-year-old Korean girl, out of the house and into a rice paddy, where he forcibly undressed her, choked and violently assaulted her, and had sexual intercourse with her.

Within a very short time after these events, the accused, his clothes and carbine covered with mud, was apprehended by Korean police in the area where the crimes occurred. The carbine had been recently fired, and was taken from the accused by Lieutenant Gordy who arrived shortly after the apprehension of accused. At that time accused appeared to have been drinking, but witnesses described him as not being drunk. There was only one American military unit in the general area, and it was a negro organization. When a report of the disturbance reached the unit, the company commander ordered a bed check and the accused was the only member unaccounted for.

Accused was tried by general court-martial on two charges. Charge I in-

volved violations of the 92d Article of War, 10 USC § 1564, and included three specifications. Two of the specifications alleged the unpremeditated murders of Shin Jai Won and Chung Hak Soo, and the third alleged the rape of Kim Chung Cha. Charge II involved violations of the 93d Article of War, 10 USC § 1565. There were four separate specifications, alleging assaults with a dangerous weapon, with intent to do bodily harm, upon An Sun Yea, Kim Ok Whan, Lee Yong Sun, and Shin Chong Kap, respectively. The accused pleaded not guilty to all charges and specifications. He was found guilty of all offenses and the death sentence was imposed. The convening authority disapproved the finding of guilty of the crime alleged in the fourth specification under Charge II, approved all other findings and affirmed the sentence as imposed. The board of review in the office of The Judge Advocate General, United States Army, affirmed.

The assignments of error advanced by appellate defense counsel on this appeal may be grouped into four classifications, namely, (1) inadequate representation by defense counsel; (2) incompetency of certain evidence and testimony; (3) insufficiency of the evidence to sustain the finding; and (4) erroneous instructions given to the court-martial members by the law officer. These will be discussed seriatim.

I

The foundation of the first assignment of error advanced by appellate defense counsel is an allegation that the legal representation afforded accused at his trial lacked the quality necessary to insure him a fair trial. He attempts to substantiate the claim in part by an unsworn statement attached to his petition for review. We shall, for the purposes of this case, consider the statement as if it were properly before us. However, it is so indefinite, uncertain and so lacking in substance that it adds little or nothing to his contention. Article 27(a), Uniform Code of Military Justice, 50 USC § 591, requires that the convening authority appoint counsel for the accused, and paragraph 48a, Manual

for Courts-Martial, United States, 1951, provides, in part, as follows:

"The accused shall have the right to be represented in his defense before a general or special court-martial by civilian counsel if provided by him, or by military counsel of his own selection if reasonably available, or by the defense counsel duly appointed pursuant to Article 27. Should the accused have counsel of his own selection, the duly appointed defense counsel and assistant defense counsel, if any, shall, if the accused so desires, act as his associate counsel; otherwise they shall be excused by the president of the court. . . . ."

In the case at bar, accused was represented at the trial by two officers. One, a member of the Quartermaster Corps, was not qualified within the meaning of Article 27 (b) of the Code, supra, but was selected by accused as his personal representative; the other, appointed by the convening authority, was a captain of The Judge Advocate General's Corps who had the requisite qualifications and an officer who had appeared as counsel in many trials. The accused admits consulting with his personally selected counsel on two occasions before trial, the first time at least one month in advance of the hearing. He does not claim his own counsel was derelict in his duty or that he did not have a full and fair opportunity to develop all phases of his defense. Neither does he assert dissatisfaction with appointed counsel. Both counsel were accessible, were present during trial, advised with accused, cross-examined the witnesses, presented arguments to the court-martial, and disclosed a good working knowledge of the rules of evidence. Hearsay evidence and conclusions were objected to, appropriate motions were made, and a theory of defense, lack of identification, was developed.

We believe the requirements of the applicable provisions of the Code and Manual, and of military due process were fully met. Those require that accused be afforded the help and guidance of military counsel with certain specified qualifications or of counsel of his own choice. Here he had both. At times

it appears as if persons convicted of offenses believe the right was denied because their counsel fails to win. While it is realized that statutory requirements do not assure trial competency they do require knowledge of the law. Undoubtedly, it would be desirable to furnish every accused with a mature and experienced trial lawyer but that is presently an impossibility. The best that can be done is to assure appointment of officers who are reasonably well qualified to protect their substantial rights.

A reference to the rule announced by civilian courts in interpreting the Constitutional guarantee of right to counsel is helpful. The principle adopted by them is stated in Conley v Cox, 138 F2d 786 (CA 8th Cir), as follows:

". . . The Constitution does not guarantee that counsel appointed for, or employed by, a defendant shall measure up to his notions of ability or competency. It was enough that the trial court appointed a qualified attorney to represent the petitioner, and that the attorney appeared, advised with, and represented him. . . . ."

After appointment of counsel, as required by the Code, an accused, if he contends his rights have not been fully protected, must reasonably show that the proceedings by which he was convicted were so erroneous as to constitute a ridiculous and empty gesture, or were so tainted with negligence or wrongful motives on the part of his counsel as to manifest a complete absence of judicial character. See Diggs v. Welch, 148 F2d 667 (CA DC Cir). This principle must be strictly adhered to, else every unsuccessful representation would be urged as a basis for reversal. Few trials are free from errors of judgment on the part of counsel and there are no standards in a record by which we can measure some of the claimed errors. Many records reflect examples of doubtful trial tactics but counsel cannot be censored for not adopting the best. It must be remembered that appellate counsel and this Court have the advantage of viewing the record after the

findings and verdict, and when the decisions made in the conduct of the trial may be distorted by our lack of the knowledge possessed by trial counsel. It is all too easy for a losing litigant to complain on appeal of too few conferences, failure to call witnesses, lack of cross-examination and other items too numerous to mention. But usually, as in this case, they fail to suggest how or in what way they have been prejudiced. It hardly need be said that if there are no facts or theories to develop, conferences are of little help; if there are no witnesses favorable to the accused, counsel cannot be criticized for failure to call; and too much cross-examination is often more damaging than too little.

The case now before us involves a capital offense, and accused's conviction resulted in the imposition of the death penalty. Under those conditions we cannot stress too strongly the necessity of protecting zealously the rights of the accused. However, it is not unreasonable to assume that any lawyer worth his salt would call witnesses when their testimony would be favorable to his client. There is no showing by the accused that any witness would testify in his favor and certainly without a factual basis we cannot say that the failure to produce evidence was the result of negligence or misconduct on the part of defense counsel. Moreover, not to engage in extensive cross-examination does not establish incompetency. There are so many imponderables which enter into forming an intelligent approach to this problem, not reflected in the record, that an appellate court can only speculate on what might have been the best procedure. Again we must assume that defense counsel performed their duties diligently, and that after due consideration it was decided to be good trial tactics not to permit witnesses to be given an opportunity to retell the sordid details of these crimes.

One further point may be mentioned in this connection. Accused was specifically asked by the law officer immediately prior to the closing of the court for deliberation on the findings, as to whether or not he had any further evidence to offer and whether he desired to make a statement, either sworn or un-

sworn, in his own behalf. He replied in the negative. We can only assume that his present claim that an unidentified witness, whose testimony is not shown, was not called, was an afterthought. The first assignment of error is therefore overruled.

## II

One of the witnesses appearing against the accused was the ten-year-old Korean girl, the victim of the rape. Appellate defense counsel contend that she was incompetent to testify. Regarding the competency of children to testify before courts-martial, the Manual for Courts-Martial, United States, 1951, paragraph 148b, page 277, states as follows:

"The competency of children as witnesses is not dependent upon their age, but upon their apparent sense and their understanding of the difference between truth and falsehood and the moral importance of telling the truth. Such sense and understanding may appear upon such preliminary questioning of the child as the court deems necessary, or from the appearance of the child and the testimony that he gives in the case. In this connection, the court should bear in mind that the competency as a witness of a person below the age of fourteen cannot be presumed."

The Manual further provides on page 276:

"Any known objection to the competency of a witness should be made before he is sworn. If his incompetency should later appear, however, a valid objection should be sustained or the court of its own motion should refuse to hear him further and order that any testimony that he may have given be disregarded."

In the instant case when the Korean girl was called to the witness stand she was asked if she were a Christian. After replying in the negative, she was sworn with the oriental oath. At that time there was no objection to her competency to testify. She testified that she was twelve years old by oriental computation (ten years by occidental)

and that she had attended four years of school. Her replies to the interrogations regarding the events of the night of April 12 were clear, responsive and intelligent. There is no indication that she failed to understand the meaning of the questions propounded or that she failed to comprehend her obligation to tell the truth. The story told by her was not contradicted by any other witness, but was corroborated by the testimony of several. After observing her demeanor on the witness stand and after listening to her relate her version of the offense, defense counsel raised no issues as to her competency. This contention was asserted for the first time on appeal. The determination of the child's competency to testify is within the discretion of the law officer. The weight to be given to her testimony was for the court-martial to determine. They had the opportunity to observe her demeanor and assess the truthfulness of her statements. This Court, with only a written record of the proceedings before it, may not disturb these determinations in the absence of a clear abuse of discretion or mistake of law. In United States v. Slozes (No. 12), 1 CMR 47, decided November 20, 1951, we stated:

"Since the trial judge—the court-martial in a military case—is in a peculiar position to observe the infant's conduct, and to determine whether he possesses or lacks the requisite intelligence, it is equally well settled that it is the duty of the trial court to ascertain whether the infant is competent to be a witness, rather than that of an appellate tribunal with only the record of trial before it. Consequently the determination of this question in the court of first instance will not be disturbed on review unless it clearly appears that there has been an abuse of discretion or that action has been based on mistake of law."

No such abuse of discretion or mistake of law appearing in the record before us, it follows that the determination of competency must be upheld.

### III

The contention of appellate defense counsel as to the erroneous admission of the testimony of Major ■■■■■■ ■ Richmond does not warrant lengthy discussion. He testified that the shells and cartridges found at the locations of the crimes had been fired from accused's gun. His conclusions were based on the usual tests performed by ballistics experts in determining whether a particular weapon fired the recovered bullets. At the commencement of his testimony, defense counsel announced that they would stipulate that he was a qualified ballistics expert, thus waiving the requirement that his qualifications be proved. In addition to this, the law officer, on behalf of the court, questioned Major Richmond and laid a proper foundation for his testimony as to his experience in that field. His evidence was material and competent and there was no error committed in admitting it in evidence.

### IV

Appellant next contends that a certain statement made by Dr. Furnas prejudiced his cause. During the course of his testimony, the doctor stated that after examining the ten-year-old Korean girl he reached medical conclusions which would be compatible with a diagnosis of rape. Defense counsel interposed an objection on the grounds it was a conclusion and the law officer agreed and so held. Trial counsel then rephrased the question and an objection on the ground that it was leading was sustained. The doctor then testified as to the physical condition of the victim. We find no error prejudicial to accused in this procedure.

### V

It is next contended that the testimony regarding the offense of arson should have been excluded. ■■■■■■ ■ Conceding that evidence of a separate offense not charged is ordinarily inadmissible against an accused, when, as here, the questioned testimony is part of the events and circumstances surrounding the offense charged and so closely related thereto as to show a plan or scheme or to establish the intent pos-

sessed by the accused, it is admissible. The testimony of some of the witnesses was to the effect that the soldier, after attempting to force his way into the Korean house, without success, pulled some straw from the roof, placed it by the side of the house, and set it on fire; and, that, because of this act, one of the assault victims was required to open up the premises. In the light of the record, we conclude that the evidence of arson was admissible to show a plan of the accused to gain entry into the house, by whatever means necessary. Accordingly, we find error was not committed by showing this offense as part of the sequence of events.

## VI

The next contention of appellant attacks the sufficiency of the evidence to identify the accused as the ▮▮▮▮ ▮ perpetrator of the offenses. None of the victims specifically identified accused as the offender, although they all described the perpetrator as a hatless negro soldier. One assault victim pointed out accused and testified that he was "similar as [sic] the person who shot at me that night." If that were all the record revealed on the issue of identification, the contention of defense counsel would have merit. However, the testimony of the witnesses and the facts and circumstances spin a web of identity so tightly around accused that no reasonable doubt arises as to this element. We briefly mention them: The unit of which accused was a member was the only one located in the area. After the events were reported to the unit commander, he ordered an immediate check of the personnel of the unit, and at that time, accused was the only person unaccounted for. The rape took place in a muddy rice paddy. Within a relatively short time after the offenses were committed, the accused was apprehended near the scene of the events, hatless, muddy, and with a recently fired carbine in his possession. The carbine was turned over to investigating officers who subsequently identified it as the gun from which bullets and shell fragments found near the victims had been fired. The time, the sequence of the events, the condition of accused's clothes, the

immediate check on all military personnel in the area, the unexplained absence of accused from his unit, his presence in the vicinity where the crimes occurred, and his possession of the carbine which fired the shots, furnish substantial support for the finding that accused committed the crimes.

## VII

Lastly, appellate defense counsel make several assignments of error based upon the alleged deficiencies in the instructions given by the law officer. Specifically, they contend that certain technical words should have been defined; that instructions should have been given on lesser included offenses, and on the issue of identification.

We are satisfied that the record does not show any issue as to lesser included offenses of unpremeditated murder or rape. Furthermore, the words used by the law officer were of common usage and did not require definition. The other alleged deficiencies in the instructions are unimportant, or the subject of requests by defense counsel, with one exception, and this concerns the charge given on the assault specifications. In the instructions on the offenses alleged in those ▮▮▮▮ ▮ specifications charging assaults with a deadly weapon with intent to do bodily harm, the law officer employed the language of paragraphs 180*l*, and 180*l*(a), Manual for Courts-Martial, U. S. Army, 1949, and instructed the court-martial that they could return a finding of guilty of the offense if they found from the evidence (1) that the accused assaulted the persons named with a certain weapon, and (2) facts and circumstances indicating that the weapon was used in a manner likely to produce death or great bodily harm. The element of the required specific intent was not included in the instructions. Similar instructions have been condemned by us in United States v. Cromartie (No. 374), 4 CMR 143, decided August 6, 1952. Our holding in that case requires a holding of error in this case.

The record established beyond rea-

44

sonable doubt that the offenses of assaults with a dangerous █ weapon were committed, and that the instructions were appropriate for those offenses. The court-martial having found the accused guilty, it follows that all elements involved in the lesser offenses were considered and proven. Under Article 59 (b), Uniform Code of Military Justice, 50 USC § 646, we have power to affirm or approve so much of the finding as includes the lesser included offense and we, therefore, affirm findings of guilty of assaults with a dangerous weapon alleged under Charge II. This does not, however, dispose of the sentence. We are here faced with a series of heinous offenses; two Koreans, possibly three, were killed, three others wounded, and one child raped. The record is barren of any extenuating or mitigating circumstances. While we have reduced three assault offenses, at least one degree, and while we ordinarily consider it appropriate to have the board of review reconsider the sentence in the light of our holding, this is not made mandatory by the Code. The reduction in the nature and type of offenses in this case is so relatively unimportant, when compared with the more serious crimes committed by the accused, that

we do not believe any board of review would commute the death sentence, assuming it had the power so to do. Accordingly the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring) :

I concur fully in the opinion of the Court, but I should like to add a brief caveat. In United States v. Keith (No. 226), 4 CMR 34, decided July 3, 1952, we held that we were without statutory authority to make a determination of sentence appropriateness as a matter of fact. However, we left "for future consideration the question of whether appropriateness—or its opposite—may be determined by us in a proper case as a matter of law."

I think it important to note that in the present case we have not determined appropriateness—that is, adequacy—either as a matter of fact or as a matter of law, although the sentence as affirmed is, of course, within legal limits. We have simply sought to avoid the performance of a vain and nugatory act—the making of an empty gesture. To me the more elaborate course would simply not make sense.